UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 MAR 31  P 1: 52

U.S. DISTRICT COURT

| | |
|---|---|
| THE ESTATE OF DAVID CHIPWATA,<br>Plaintiff,<br><br>v.<br><br>OFFICER DAVID ROVINETTI, POLICE<br>CHIEF EDWARD FLAHERTY, & THE<br>WATERBURY POLICE DEPARTMENT,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 3:02CV858 (DJS) |

## MEMORANDUM OF DECISION

The estate of David Chipwata ("Plaintiff") brings this action seeking damages from defendants Waterbury Police Officer David Rovinetti ("Rovinetti"), Waterbury Police Chief Edward Flaherty and the City of Waterbury (together, "the City of Waterbury") for alleged constitutional violations stemming from Rovinetti's fatal shooting of Chipwata on March 8, 2002. Plaintiff alleges claims under 42 U.S.C. §1983 for violations of his civil rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

Defendants move for summary judgment claiming that there are no genuine issues of material fact that show a constitutional violation and further that Rovinetti is entitled to qualified immunity. The court **GRANTS** the motion **[doc. #14]** for the following reasons.

## FACTUAL BACKGROUND

This case presents the court with an unfortunate and unquestionable tragedy. David Chipwata, a native of the Democratic Republic of Congo living in Waterbury, was fatally shot by

-1-

Waterbury police officer David Rovinetti on the night of March 8, 2002. Chipwata, according to his roommate and brother-in-law, Kabwe M. Muluka, began acting strangely on March 6, 2002. Muluka contacted Bupe Matabula, Chipwata's sister, to consult with her about Chipwata's behavior. Matabula left her home in Virginia on March 7th and traveled to Connecticut to attend her brother. Early in the evening on March 8th, Chipwata, Muluka and Matabula were together in Chipwata's apartment. As the trio watched television, Chipwata became violent and, according to the statement Matabula gave police, started fighting with Matabula and Muluka. After a brief struggle, Chipwata grabbed a kitchen knife and began to cut his hair. Matabula told police that she tried to stop him from cutting his hair. Chipwata either waved his knife or tried to push Matabula out of his way with the knife. Matabula was cut on the arm as a result.[1]

After Matabula was injured, Muluka decided to contact the police because he believed Chipwata was "too violent." Muluka and Matabula retreated from the apartment to a balcony and called 911. Muluka told police that Chipwata was "so violent", that he had a knife and that he had "stabbed one of the sisters." The transcript of the 911 phone call conveys a chaotic situation in which a naked Chipwata wanders from the apartment to his car and back again, cutting his hair with a knife while his sister and brother-in-law try to both watch his movements and stay a safe distance from him. Muluka told the dispatcher that he was worried "something bad might happen to him [Chipwata]."

Waterbury police were alerted to the disturbance and three units were directed to Chipwata's apartment. The police were instructed that a black male suspect was armed with a

---

[1] Muluka told police that Matabula was cut in the hand, but she told police that the cut was to her arm.

knife and that a female victim was injured. Officer David Rovinetti was the first unit to arrive and he heard yelling from inside Chipwata's apartment as he approached. Rovinetti unholstered his weapon before knocking on the door of Chipwata's apartment. Muluka opened the door and allowed Rovinetti to enter.[2] Rovinetti observed Chipwata sitting naked on a couch.[3] Rovinetti asked Chipwata to show him the knife. Rovinetti also asked Chipwata to show his hands, a command Chipwata ignored. Chipwata then stood and went into the kitchen of the apartment. Chipwata grabbed the knife and pointed it at the officer.

At this point, the accounts of the parties diverge slightly. Rovinetti claims that he tried to grab Chipwata, but Chipwata was sweaty and Rovinetti could not control him. Matabula told police that she heard Muluka tell Rovinetti not to let Chipwata get the knife. Muluka states that he told Rovinetti that Chipwata was "crazy" just before Chipwata went into the kitchen. The parties all agree that Chipwata grabbed the knife and pointed it at the officer, but the position of the knife is in some dispute. Rovinetti states in his affidavit that Chipwata had the knife pointed at his stomach. Matabula testifies that Chipwata picked up the knife, held it out toward Rovinetti and repeatedly said "take the knife."[4] It is certain that Rovinetti instructed Chipwata to drop the

---

[2] This point is actually in doubt based on the statements of the various witnesses. Muluka and Rovinetti state that Muluka opened the apartment door. Matabula and a neighbor, Regina Fuller, state that Matabula opened the door and spoke with Rovinetti before he entered the apartment.

[3] Rovinetti claims that Chipwata was muttering, over and over, that he had killed three people, but the other witnesses do not corroborate this recollection.

[4] The court notes that Matabula's deposition testimony is in conflict with her statement to police the night of the incident. At the time Matabula told police that Chipwata held the knife over his head and approached the officer. The court notes this discrepancy, but in accord with the standard for summary judgment the court will credit only Matabula's deposition testimony.

knife and that Rovinetti retreated from the apartment. Chipwata followed Rovinetti out of the apartment with the knife blade pointed at Rovinetti. Matabula and Muluka left the apartment by a different exit and did not see the events that transpired between Rovinetti and Chipwata outside the apartment.

Rovinetti retreated out of the apartment and down a flight of stairs until he claims he could no longer retreat safely. A neighbor, Regina Fuller, told police that she saw Rovinetti retreat and that she saw Chipwata raise the knife toward Rovinetti. Rovinetti claims Chipwata advanced towards him and that he ignored repeated commands to drop the knife. Fuller states that she heard Rovinetti tell Chipwata to drop the knife. Rovinetti reported that he fired one shot before Chipwata raised the knife and then fired at least twice more, fatally wounding Chipwata.

## DISCUSSION

### I. Standard of Review

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting

Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

A party may not, however, avoid summary judgment through "mere speculation and conjecture." Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d.Cir. 2001). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The Second Circuit has also adopted specific guidelines for courts faced with the problem of a deadly-force suit where the witness most likely to contradict the police is deceased. In such situations, the court may not simply accept what may be a self-serving account by the police officer, but instead must consider circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably. O'Bert v. Vargo, 331 F.3d 29, 37 (2d.Cir. 2003); See, Plakas v. Drinski, 19 F.3d 1143, 1147 (7th Cir.) ("The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify. In any self-defense case, a defendant knows that the only person likely to contradict him or her is beyond reach. So a court must undertake a fairly critical

assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial."), *cert. denied*, 513 U.S. 820 (1994).

Officer Rovinetti and the City of Waterbury have motioned the court for summary judgement on two grounds. First, they argue that there was no excessive force and second that Officer Rovinetti is entitled to qualified immunity. The City of Waterbury also claims that there is no basis in the record for imposing liability on the city and the police chief. The legal standard for qualified immunity established by the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001) requires the court to determine whether a constitutional violation could exist before considering qualified immunity. The court will follow this prescribed mode of analysis.

## II.    Excessive Force

The use of force to apprehend a criminal suspect is a seizure subject to the reasonableness requirements of the Fourth Amendment. Tennessee v. Garner, 471 U.S. 1, 7 (1985). The court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Garner, 471 U.S. at 8 (quoting United States v. Place, 462 U.S. 696, 703 (1983)). The issue is whether "the totality of the circumstances" justifies type of seizure involved in the particular case. Garner, 471 U.S. at 8.

A police officer is permitted to use force during the course of an arrest. The force permitted is determined by a variety of factors, "including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officer or others and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. M.S. Conner, 490 U.S. 386, 396 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of the officer on the scene, rather than with the 20/20 vision of hindsight...The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-397.

The Second Circuit has refined the analysis used to determine the reasonableness of deadly force. "It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Vargo, 331 F.3d at 36. Further, the perspective of the officer on the scene used to judge reasonableness is limited to "the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." Salim v. Proulx, 93 F.3d 86, 92 (2d.Cir. 1996). "The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Salim, 93 F.3d at 91 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The present action is based on the use of deadly force by Officer David Rovinetti during the course of his attempt to arrest David Chipwata following a report of assault. Plaintiff bases his claim of excessive force on a single allegation–that Chipwata was not threatening Rovinetti but was instead attempting to surrender the knife in accord with Rovinetti's instructions. The

court will first determine if a genuine issue of material fact exists and then consider whether the force used by Rovinetti was excessive.

The facts set forth by the parties are in agreement on all of the material facts leading up to the point at which Chipwata and Officer Rovinetti confronted each other in the kitchen. Chipwata was behaving erratically. He injured his sister with a kitchen knife and Matabula and Muluka called 911 in an attempt to get the police to come to the apartment and subdue Chipwata. Officer Rovinetti arrived at the apartment and entered with his weapon unholstered, based on the shouting he heard from outside the apartment and the report that the suspect was dangerous and armed with a knife. Rovinetti noted that Chipwata was naked and unarmed. Rovinetti repeatedly asked "where is the knife?" and this seems to have prompted Chipwata to head into the kitchen and pick up the knife. Plaintiff does not dispute any of these events and the court accepts this version of the events as fact for purposes of this discussion.[5]

The sole piece of evidence in the record that might create a genuine issue of material fact is the deposition testimony of Bupe Matabula. Her version of events is as follows:

Chipwata went into the kitchen and retrieved the knife after Rovinetti asked where the knife was located. Chipwata took the knife and said, "Here is the knife you wanted. Take the knife." Rovinetti then began to back away, and Chipwata followed, saying, "Here's the knife. You wanted the knife. Here's the knife." Rovinetti opened the back door of the apartment and went outside onto a small landing that led him to a flight of stairs. Chipwata followed him with

---

[5] The court is taking the facts in the light most favorable to the plaintiff–therefore, disputed or uncorroborated statements regarding things that were said to Rovinetti by Matabula or Muluka as well as uncorroborated statements about the events up to this point made by Rovinetti will not be credited.

the knife, saying, "Get the knife. You wanted the knife, take the knife." Chipwata was holding his arm outstretched with the knife "laxed, but not like pointing." Matabula was unable to see whether Chipwata was holding the knife blade or knife handle toward the officer, but she does say that he was holding the knife "like--you know, handing somebody something." Chipwata was "handing the police officer the knife." Chipwata then seems to have raised the knife over his head, although Matabula was not certain exactly when. In response to the question "At what point did he raise the knife over his head?," she testified "I don't know. Maybe when he was going out." She further testified that her statement to police that Chipwata had the knife over his head may have referred to a period "as he [Chipwata] was going out, maybe the officer was already outside." The last thing Matabula heard as Chipwata left the apartment was him saying "'the knife, here's the knife'; raising his voice, you know, saying, 'you wanted the knife. Take the knife.'" At no time did Officer Rovinetti instruct Chipwata to drop the knife.

Plaintiff argues that Matabula's testimony is evidence that Chipwata was attempting to surrender the knife, and therefore that the reasonableness of Rovinetti's actions is in doubt, but this seems to be mere speculation regarding Chipwata's motive and not an obvious inference drawn from plaintiff's description of events. Although the court does take the facts in the light most favorable to the plaintiff, the reasonableness test requires the court to view events from the perspective of a reasonable officer. A reasonable officer, on plaintiff's facts, would be faced with an erratic suspect, accused of violent assault with a knife, holding a knife toward the officer and advancing on him while shouting "take the knife." Indeed, except for the statement "take the knife" this is exactly the situation described by Rovinetti. Further, Matabula's testimony admits that Chipwata, at some point in his advance, raised the knife over his head, a description that is

also consistent with Rovinetti's statement. The only "genuine issue" presented by the plaintiff's facts is the interpretation of their legal import–which is precisely the thing this court is charged to decide.

Assuming, *arguendo*, that plaintiff does create a genuine issue of fact regarding the threat communicated by Chipwata's actions, it is not clear that the issue is "material." There is no evidence in the record that shows Rovinetti's actions were unreasonable based on his "knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." Salim, 93 F.3d at 92. Matabula was not able to witness the tragic events in the stairwell that culminated in Chipwata's death and her testimony does nothing to create a genuine issue of material fact regarding those events. Indeed, her admission that Chipwata raised the knife over his head is, again, consistent with Rovinetti's account. The court is mindful, though, of its duty to scrutinize the circumstantial evidence to see if it can be used to reasonably discredit Officer Rovinetti's version of events. A close look at the record in this case shows that Rovinetti's account cannot reasonably be discredited.

The most favorable view of events, from the plaintiff's perspective, would have Chipwata holding the knife out toward the officer at waist level, calling on the officer to take the weapon. Rovinetti's own account of events in the stairwell is that Chipwata held the knife out and advanced toward Rovinetti until he could no longer retreat safely. Rovinetti then warned Chipwata to drop the knife and, fearing for his life, fired a shot at the deceased. Chipwata then raised the knife over his head before Rovinetti fired three more shots, mortally wounding Chipwata. All of the circumstantial evidence supports Rovinetti's claim.

First, the court notes that Muluka's uncontradicted statements to police supports Rovinetti's version of events. The only other witness to the events in the stairwell, Regina Fuller, describes a sequence of events that fits closely with the defendant's claims. Fuller describes a uniformed officer, backing out of Chipwata's apartment, followed by a black man holding a raised knife toward the officer and ignoring shouted warnings to drop the knife.[6] There is no evidence anywhere in the record to suggest that Rovinetti's story is inconsistent with any other facts.

Ultimately, the court finds that there is no genuine issue of material fact regarding the actions of Chipwata or Rovinetti. Plaintiff does argue that there might have been an alternate interpretation of Chipwata's intentions, but this is too speculative to make summary judgment inappropriate. Indeed, the objective reasonableness standard admits that there may be multiple interpretations of an event--in fact, the standard accepts that the defendant's interpretation of events may be wrong. The issue is not the accuracy of the defendant's interpretation, but rather its reasonableness–whether it, on its own terms, is a plausible interpretation of events.

Here, Rovinetti's interpretation that he faced a significant threat of death or bodily harm is clearly reasonable. There is no dispute that Chipwata, known to the officer as the suspect in an alleged violent assault, was advancing on the officer, knife in hand, ignoring instructions to drop the weapon. Under these circumstances, a reasonable officer could believe that he was about to be attacked and perhaps killed. The law permits officers to make difficult and often dangerous

---

[6] Fuller also described Chipwata as yelling that he did not care if Rovinetti shot him, but the court will construe her testimony in the light most favorable to the plaintiff and assume that Chipwata was silent.

choices such as those made by Officer Rovinetti. The facts of this case do not support the claimed constitutional violation.

### III.   Qualified Immunity

Absent a finding that there could be a constitutional violation, "there is no necessity for further inquires concerning qualified immunity." Saucier, 533 U.S. at 201. The court finds that there is no valid claim in the present action to provide immunity from, and so the court will not rule on Officer Rovinetti's claim of qualified immunity.

### IV.   Claims Against the City of Waterbury

Plaintiff also brings a claim against the City of Waterbury alleging a failure to properly train Officer Rovinetti. A municipality is subject to liability for damages under 42 U.S.C. §1983 for the unconstitutional acts of its employees, when those acts may fairly be said to represent official policy. Monell v. Dep't of Social Services, 436 U.S. 658, 695 (1978). When a municipality's failure to train its employees evidences a deliberate indifference to the rights of its citizens, the failure to train can be construed as a policy or custom that is actionable pursuant to Monell and §1983. City of Canton v. Harris, 489 U.S. 378, 389 (1989). The municipal liability, though not based on *respondeat superior*, is nonetheless derivative to the extent that it rests on the unconstitutional actions of a municipal employee. Thus, if the employee is not liable for a constitutional violation, there is no basis for municipal liability. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

The court has determined that there is no basis, on the facts presented, for finding Officer Rovinetti liable of a constitutional violation. Absent a finding of such liability, there is also no

basis for plaintiff's claim against the City of Waterbury.

## CONCLUSION

Defendant's motion for summary judgment **[doc. #14]** is **GRANTED**. The clerk of the court shall enter judgment in favor of the defendants on all counts.

**IT IS SO ORDERED** at Hartford, Connecticut, this 31st day of March, 2004.

DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE